IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION
CIVIL NO._____

THE BLACKSTONE HEADWATERS COALITION, INC.,

      Plaintiff,

v.

GALLO BUILDERS, INC.,
ARBORETUM VILLAGE, LLC,
STEVEN A. GALLO,
and ROBERT H. GALLO,

      Defendants.

**COMPLAINT**

Plaintiff alleges:

## I.  INTRODUCTION

1.     This action is brought under the citizen suit provision of the Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. ("Clean Water Act," or "CWA"). Defendants, two construction development companies and their principals, are violating the CWA at their residential construction development, "Arboretum Village Estates," in Worcester, Massachusetts (the "Site," or the "Project").  Defendants are violating the CWA at the Site by failing to obtain and adhere to the conditions of a required National Pollutant Discharge Elimination System  ("NPDES") permit—namely, the Construction General Permit ("CGP").  As a result of Defendants' CWA violations, sediment-laden stormwater runoff from the Site is polluting waters of the United States, particularly the Blackstone River, its tributaries, and wetlands adjacent to those tributaries.

2.     The United States Environmental Protection Agency ("EPA") has identified sediment pollution as the most significant cause of water quality degradation in the United States.  Sediment pollution has a wide range of adverse effects on the ecology of wetlands and water systems: it degrades habitats; it smothers flora and fauna; it disrupts animal feeding patterns; it inhibits animal reproduction; it decreases dissolved oxygen; it increases turbidity; and through these and other ill effects, it decreases the density, diversity, and biomass of aquatic and benthic organisms at every trophic level. Additionally, it impairs the capacity of wetlands to serve their natural function of filtering pollutants from stormwater before it enters streams, ponds, lakes, and rivers.  Sediment pollution also facilitates other types of water pollution—pollutants such as metals, organic compounds, and fertilizing nutrients bind themselves to sediment particles and are thus more readily mobilized during storms.  As a result of sediment pollution, man's practical, economic, recreational, and aesthetic use and enjoyment of the waters of the United States—for drinking, for boating, for fishing, for swimming, for the viewing of wildlife, and for the countless other ways in which water is woven into the everyday experience of Americans—is severely diminished.

3.     As relief in this action, Plaintiff seeks, inter alia, (a) a declaration that Defendants have violated the CWA, and continue to violate the CWA, as alleged herein, (b) an injunction against Defendants' further CWA violations, (c) an injunction requiring that Defendants restore any and all wetlands and waters that they have polluted with sediment, (d) an assessment of civil penalties against Defendants, and (e) an assessment of Plaintiff's costs against Defendants, including Plaintiff's attorney fees and expert witness fees.

## II.  JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action under Section 505(a) of the CWA, 33 U.S.C. § 1365(a) (the CWA's citizen suit provision), and 28 U.S.C. § 1331 (federal question jurisdiction).

5.      Plaintiff has complied with the notice provisions of the CWA's citizen suit provision, 33 U.S.C. § 1365(b), as elaborated at 40 C.F.R. § 135.  Pursuant to 33 U.S.C. § 1365(b)(1)(A), a citizen who intends to sue under the CWA must give the alleged violator 60 days of notice prior to filing suit.  By letter sent via certified mail on March 4, 2016, attached hereto as Exhibit 1, Plaintiff notified Defendants of its intent to sue under the CWA's citizen suit provision.  At the time of the filing of this Complaint, more than 60 days have passed since March 4, 2016.

6.      In conformance with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), and 40 C.F.R. § 135.2(a)(1), copies of the aforementioned letter were sent to EPA Administrator Gina McCarthy, Region 1 EPA Administrator H. Curtis Spalding, and Massachusetts Department of Environmental Protection ("MassDEP") Commissioner Martin Suuberg.

7.      In conformance with Section 505(c)(3) of the CWA, 33 U.S.C. § 1365(c)(3), and 40 C.F.R. § 135.4, copies of this Complaint are being sent to U.S. Attorney General Loretta E. Lynch, EPA Administrator Gina McCarthy, and Region 1 EPA Administrator H. Curtis Spalding.

8.      Under Section 505(b)(1)(B) of the CWA, 33 U.S.C. § 1365(b)(1)(B), a citizen may not commence any action against a violator of the CWA if the EPA or State has commenced, and is diligently prosecuting, a civil or criminal action in court against

the violator.  So far as Plaintiff is aware, neither the EPA nor the State of Massachusetts has commenced, and is diligently prosecuting, a civil or criminal action in court against Defendants.

9.      Under Section 309(g)(6)(A)-(B) of the CWA, 33 U.S.C. § 1319(g)(6)(A)-(B), a citizen may not commence a civil penalty action against a violator of the CWA if the EPA or State (under a comparable state law) has commenced, and is diligently prosecuting, an action for administrative penalties against the violator for the same violation(s), unless the citizen's notice of intent to sue was sent prior to the commencement of the EPA or State action, and the citizen's complaint is filed within 120 days of the date on which such notice was sent.  So far as Plaintiff is aware, neither the EPA nor the State has commenced, and is diligently prosecuting, an administrative penalty action against Defendants for the violations alleged herein.  In the event that an EPA or State administrative penalty action has been commenced since Plaintiff notified Defendants of its intent to sue, such action would not forestall Plaintiff's civil penalty action, because fewer than 120 days have passed since Plaintiff notified Defendants of its intent to sue.

10.     The Central Division of the Massachusetts District of the Federal Court is the proper venue for this action pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the CWA violations alleged herein are occurring within this division of this district.

### III. PARTIES

#### Plaintiff

11.     The Blackstone Headwaters Coalition, Inc. ("BHC"), is a non-profit corporation organized under the laws of Massachusetts, with its office located at 414 Massasoit Road, Worcester, MA, 01604.  Plaintiff's mission is to restore and protect water quality and wildlife habitat in the Blackstone River.  To this end, Plaintiff directs and supports various educational and scientific initiatives in and around Worcester designed to inform the public concerning pollution of the Blackstone, and to spread awareness and adoption of sound pollution prevention practices and technologies.

12.      Plaintiff and its members have a recreational, aesthetic, historical, and environmental interest in the Blackstone River and its tributaries.  Plaintiff's members use and enjoy these waters for recreation, sightseeing, wildlife observation, and other activities.  Plaintiff's members also devote significant amounts of time to volunteer projects aimed at protecting and restoring these waters.

13.     Plaintiff and its members are adversely affected by Defendants' CWA violations because the violations result in the sediment pollution of the Blackstone River and its tributaries, thus diminishing the quality of these waters and diminishing Plaintiff's members' enjoyment thereof.   Defendants' Construction General Permit ("CGP") violations, which involve the defective design, installation, monitoring, and maintenance of the Site's erosion and sediment control systems, result directly in the sediment pollution of the Blackstone River and its tributaries.  Defendants' failure to obtain CGP coverage (in the case of Gallo Builders, Inc.) results indirectly in such sediment pollution,

because it leads Gallo Builders, Inc. to suppose itself unbound by the permit requirements, and thus encourages its neglect of erosion and sediment control at the Site.

14.     The injunctions and civil penalties sought by Plaintiff in this case will serve to redress the harm that Defendants' CWA violations are doing and have done to Plaintiff and its members.  Defendants' pollution will be remedied and deterred.

### Defendants

15.     Defendant Gallo Builders, Inc. ("Gallo Builders"), is a corporation organized under the laws of Massachusetts, with a principal place of business at 31 Gallair Circle, Holden, MA, 01520.  Gallo Builders is the builder of the Project and the Site operator.  Gallo Builders is liable under the CWA both for failing to obtain CGP coverage and for the violations of the CGP alleged herein.

16.     Defendant Arboretum Village, LLC is a limited liability company organized under the laws of Massachusetts, with a principal place of business at 31 Gallair Circle, Holden, MA, 01520.  Arboretum Village, LLC is the owner of the undeveloped portions of the Site, and the entity whom Defendants apparently intend to put forward as Site operator for CGP purposes.[1]  Arboretum Village, LLC is liable under the CWA for the violations of the CGP alleged herein as avowed Site operator.

17.     Defendant Steven A. Gallo, of Holden, MA, is President, Director, and principal of Gallo Builders, and has an executive role in the business of Arboretum Village, LLC.   Steven A. Gallo shares executive authority over both companies with

---

[1]  According to the EPA's searchable database of CGP permittees (https://ofmpub .epa.gov /apex/aps/f?p=CGP_2012:HOME (viewed May 5, 2016)), only an entity named "Arboretum Estates, LLC" has obtained CGP coverage for itself as operator of the Site, under NPDES Permit Tracking No. MAR12A693.  Because there is not, according to the Massachusetts Secretary of State, any legal entity named "Arboretum Estates, LLC," it is assumed here that Defendants intended to name Arboretum Village, LLC as Site operator.

Defendant Robert H. Gallo, including authority over erosion and sediment control decisions and investments at the Site.   Steven A. Gallo is liable in his individual capacity for the CWA violations alleged herein by virtue of his position as Arboretum Village, LLC's and Gallo Builders' responsible corporate officer.

18.     Defendant Robert H. Gallo, of Holden, MA, is Treasurer, Director, and principal of Gallo Builders, and the managing member of Arboretum Village, LLC. Robert H. Gallo shares executive authority over both companies with Defendant Steven A. Gallo, including authority over erosion and sediment control decisions and investments at the Site.   Robert H. Gallo is liable in his individual capacity for the CWA violations alleged herein by virtue of his position as Arboretum Village, LLC's and Gallo Builders' responsible corporate officer.

### IV.  STATUTORY AND REGULATORY FRAMEWORK

19.     The objective of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

20.     Section 301(a) of the CWA, 33 U.S.C. § 1311(a), as clarified by the CWA's definitional section at 33 U.S.C. § 1362, prohibits the discharge of any pollutant by any person from a point source to waters of the United States unless the discharge is in compliance with various enumerated sections of the CWA—among them, Section 402 of the CWA, 33 U.S.C. § 1342.  A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  "Waters of the United States" includes, inter alia, all interstate waters, all

tributaries to interstate waters, and all wetlands adjacent to interstate waters and their tributaries. *See* 40 C.F.R. § 122.2.

21.     Under Section 402(a) of the CWA, 33 U.S.C. § 1342(a), as implemented by the EPA's regulations at 40 C.F.R. § 122.26(b)(14)(x), dischargers of stormwater associated with industrial construction activity—that is, construction activity that disturbs five or more acres of land (or disturbs less than five acres, but is part of a larger plan of development that disturbs five or more acres)—are required to obtain and adhere to the terms of a National Pollutant Discharge Elimination System (NPDES) permit.

22.     Pursuant to 40 C.F.R. § 122.28, the EPA issues general NPDES permits to cover certain categories of stormwater dischargers. One such general permit issued by the EPA is the CGP. The current CGP was issued by the EPA in 2012.[2] To obtain coverage under this permit, an operator of a construction development must prepare and file a Notice of Intent with the EPA. Fourteen days after such filing, unless the EPA notifies the applicant that authorization has been delayed or denied, the applicant is considered covered by the CGP. *See* CGP Part 1.4.

23.     An "operator," as referred to in the preceding paragraph, is either (a) a party with operational control over construction plans and specifications, including the ability to make modifications to those plans and specifications, or (b) a party with day-to-day operational control of those activities at a project that are necessary to ensure compliance with the conditions of the CGP. *See* CGP Part 1.1.a. Where multiple parties at a development fit this definition of "operator," each of them must obtain CGP coverage. Id.

---

[2] References to the CGP in this Complaint are to the 2012 version of the CGP. The 2012 CGP can be found online at: https://www.epa.gov/npdes/epas-2012-construction-general-permit-cgp-and-related-documents.

24.     The CGP imposes various conditions on operators of construction developments that are intended to prevent the discharge of polluted stormwater—particularly, sediment-laden stormwater—to waters of the United States.  The CGP requires, inter alia, that operators design, install, monitor, and maintain effective erosion and sediment control systems, conduct regular site inspections using qualified personnel, and take prompt corrective action when deficiencies in erosion and sediment control are observed.  *See* CGP Parts 2, 4, 5, and 6.

25.     Aside from the practices that it specifically mandates, the CGP incorporates a large body of state and municipal water protection law by reference, including any Order of Conditions issued by a town or city's Conservation Commission. *See* CGP Part 9.1.1.4.  Conservation Commissions are responsible for administering and enforcing the Massachusetts Wetlands Protection Act ("WPA"), M.G.L. c. 131, § 40. They may also be charged with enforcing a municipal wetlands protection ordinance, as is the case in Worcester.  Pursuant to the WPA, Conservation Commissions issue Orders of Conditions to developments that propose to alter wetlands, or propose to alter lands within 100 feet of wetlands.  Orders of Conditions are meant to ensure that wetlands are protected during the process of construction.

26.     Under Section 505 of the CWA, 33 U.S.C. § 1365, any person adversely affected by another's unpermitted discharge of a pollutant to waters of the United States, or by another's violation of a condition of a NPDES permit, may sue to enjoin such violation, and to impose civil penalties on the violator.  A plaintiff who substantially prevails in such suit may be awarded costs of litigation, including attorney and expert witness fees.  *See* 33 U.S.C. §§ 1365(a) (any "citizen" may sue to enforce a CWA

"effluent standard or limitation");  1365(f)(1) & (6) ("effluent standard or limitation" means, inter alia, the CWA's prohibition on unpermitted discharges, and NPDES permits or conditions thereof);  1365(g) ("citizen" means a person or persons with an interest that is or may be adversely affected by a violation of a CWA effluent standard or limitation); 1365(d) (litigation costs are awardable).  The maximum civil penalty assessable per CWA violation is $37,500, for each day that such violation persists.  *See* Section 309(d) of the CWA, 33 U.S.C. § 1319(d) (re. civil penalties generally);  40 C.F.R. § 19.4 (adjusting civil penalty amount for inflation to $37,500 as of January 12, 2009).

## V.  GENERAL ALLEGATIONS

27.     The Site consists of approximately 70 acres of land located on the western slope of a steep hill in southern Worcester, with a small portion of the land located in the Town of Auburn.  A 2003 aerial photograph of the Site is attached hereto as Exhibit 2 (Site outlined in red).  Several wetlands and streams exist on the Site, among them a wetland and stream located in the central western portion of the Site, at the foot of the steepest part of the hill.  This wetland and stream (the "Sophia-Honeysuckle[3] wetland and stream") are outlined in blue on the attached Exhibit 2.  Waters from the Sophia-Honeysuckle wetland and stream flow southward into another stream at a point near the southwest extremity of the Site.  That stream, in turn, flows southward through Auburn for approximately one kilometer before emptying into the Worcester Flood Diversion Channel.  The Worcester Flood Diversion Channel flows southeastward through Auburn and Millbury into the Blackstone River.  A 2003 aerial photograph attached hereto as Exhibit 3 shows the course of these waters from the Site to the Blackstone River.

---

[3] Sophia Drive and Honeysuckle Road are two roads of the Project that border the wetland and stream, respectively, to its west and east.

28.     Through several transactions conducted between 1993 and 2005, a number of companies owned or controlled by Defendants Robert H. Gallo and/or Steven A. Gallo ("Gallos") acquired the Site from a prior developer and its mortgagee.  The Gallos consolidated ownership of the Site under their company Fox Hill Builders, Inc. in 2005.

29.     In February of 2006, Defendant Gallo Builders filed a Notice of Intent with EPA and received CGP coverage for itself as operator of the Site, under NPDES Permit Tracking No. MAR10C079.  Shortly thereafter in 2006, Gallo Builders began construction of Phase II of the Project—Phase I having been constructed, or partially constructed, by the prior developer.[4]

30.     The Project has progressed fitfully since 2006.  In total, the Project will involve the construction of approximately 368 housing units (comprising 179 duplex homes and 10 single family homes), approximately 12 roads, and associated infrastructure.  It will involve the disturbance of approximately 44 acres of land, and will create approximately 20.36 acres of impervious area.  An aerial photograph (Exhibit 4) shows the condition of the Site on May 6, 2015.

31.     From 2006 to the present day, Defendant Gallo Builders has been the builder of the Project.  Gallo Builders deploys its employees, equipment, and contractors to build the Project's homes, roads, and infrastructure.

32.     From 2006 to the present day, Defendant Gallo Builders has had day-to-day control over operations at the Site, including control over the design, installation,

---

[4]  The prior developer had proposed and received regulatory approval in the 1980's to build a residential subdivision named "Arboretum" on the Site.  From historical records and aerial photographs, it appears that this developer developed a small portion of the Site in the 1980's and 1990's—including the construction of the streets Arboretum Drive and Sarah Drive, and homes thereon.  This previously developed area is outlined in yellow on the attached Exhibit 2.

monitoring, and maintenance of the Site's stormwater management and erosion and sediment control systems.

33.     From 2006 to the present day, Defendant Gallo Builders has had control over the Site's construction plans and specifications, including the ability to make modifications to those plans and specifications.

34.     In 2007, the Gallos created a new company, Defendant Arboretum Village, LLC.  They then conveyed the undeveloped parts of the Site from Fox Hill Builders, Inc. to Arboretum Village, LLC.

35.     From 2007 to the present day, Arboretum Village, LLC has served as a holding company for Site property.  When a dwelling unit is ready for sale, the unit is conveyed by Arboretum Village, LLC to another Gallo entity, Arboretum Estates, Inc., which in turn sells the unit to the homebuyer.  Arboretum Village, LLC does not play any actual role in day-to-day operations at the Site.

36.     In 2012, the EPA issued the current version of the CGP.  Operators of existing construction sites who had received coverage under a former version of the CGP were required to file a new Notice of Intent with the EPA.  Gallo Builders did not file a new Notice of Intent as the Site's operator, and its coverage expired.  Instead, a Notice of Intent was filed in the name of the nonexistent entity "Arboretum Estates, LLC"—Defendants presumably intended to name Arboretum Village, LLC (see footnote 1, *supra*)—which received CGP coverage as Site operator on May 29, 2012.

37.     For a decade since commencing work on the Project in 2006, Defendants have consistently failed to design, install, monitor, and maintain effective stormwater management and erosion and sediment control systems.  As a result of these failures,

during storms, silt-laden stormwater has been running off of the Site's disturbed areas and into its wetlands and streams—particularly, the aforementioned Sophia-Honeysuckle wetland and stream—and then into the stream running south from the Site through the Town of Auburn, then into the Worcester Flood Diversion Channel, and into the Blackstone River.

38.     Beginning in 2006, Defendants have repeatedly been cited, fined, sanctioned and rebuked by MassDEP, the Worcester Conservation Commission, and the Worcester Department of Public Works and Parks for their failures of erosion and sediment control at the Site.

39.     A decade of citations, fines, sanctions, and rebukes from regulatory authorities has not altered Defendants' disposition to neglect erosion and sediment control at the Site.  In recent years, notwithstanding continuing governmental reproach, Defendants' neglect has continued.

40.     Currently, Defendants are building Phase IV of the Project.  This phase is located on the high ground of the Site, near the top of the hill.  It involves the construction of three roads—Bittersweet Boulevard, Indigo Circle, and Snowberry Circle—and approximately 35 duplex homes (70 units).  An engineer's plan of Phase IV is attached as Exhibit 5.  A 2015 aerial photograph of the Site outlining the area of Phase IV is attached as Exhibit 6.

41.     Phase IV of the Project is subject to an Order of Conditions issued by the Worcester Conservation Commission on April 16, 2010, which has since been amended on August 18, 2015.  The original and amended Orders of Conditions for Phase IV are attached hereto as Exhibit 7 and Exhibit 8.

13

42.     Defendants are now building the main road of Phase IV, Bittersweet Boulevard.   Defendants have been fitfully engaged in the construction of Bittersweet Boulevard since approximately 2012.  To date, they have built a northern segment of the road, along with several homes on its eastern side.  Defendants have also cleared and exposed a large area of soil to the south of the northern segment, where most of Phase IV will be built.

43.     Much of the stormwater that falls on the exposed soils of Phase IV flows northward, back toward the northern paved segment of Bitttersweet Boulevard.  There is a pair of catch basins on that segment of Bittersweet Boulevard.  When stormwater enters these catch basins, it is conveyed downhill via an underground pipe to an outfall (the "Honeysuckle Road outfall"), where it is discharged to the Sophia-Honeysuckle wetland and stream.  The approximate locations of the Bittersweet Boulevard catch basins, the underground pipe, and the Honeysuckle Road outfall are marked on a 2015 aerial photograph attached as Exhibit 9.

44.     During storms since Defendants installed the Bittersweet Boulevard catch basins in 2012 or 2013, Defendants have routinely allowed silt-laden stormwater runoff from the exposed soils of Phase IV to flow into the Bittersweet Boulevard catch basins, and down into the Sophia-Honeysuckle wetland and stream.

45.     On June 20, 2013, as a result of Defendants' repeated silt-laden discharges and repeated failures of erosion and sediment control on Bittersweet Boulevard and other parts of the Site—among them, a steep slope that Defendants had cut to the west of Bittersweet Boulevard, whose exposed and erodible soils were running off into the back yards of Honeysuckle Road residents, and onto Honeysuckle Road—MassDEP issued a

14

Unilateral Administrative Order demanding, inter alia, that Defendants immediately take every reasonable step to prevent further violations of the Massachusetts Wetlands Protection Act ("WPA") and Massachusetts Surface Water Quality Standards, immediately install erosion controls designed to stabilize all exposed and erodible areas of the Site and prevent additional alterations of wetlands resource areas, and within 30 days develop a comprehensive erosion and sediment control program for the Site, one specifically addressing both the erosion and sediment control failures on Bittersweet Boulevard, and on the steep slope between Bittersweet Boulevard and Honeysuckle Road.

46.     On July 26, 2013, as a result of Defendants' repeated silt-laden discharges and repeated failures of erosion and sediment control on Bittersweet Boulevard and other parts of the Site, the Worcester Conservation Commission issued an Enforcement Order against Defendants, finding them in violation of both the Massachusetts Wetlands Protection Act and the City of Worcester's Wetlands Protection Ordinance.  The city's Order echoed MassDEP's demands of June 20, 2013, and demanded additionally that Defendants take the Bittersweet Boulevard catch basins off line and install temporary sediment basins sufficient to handle the volume of stormwater running off of the exposed soils of Phase IV.

47.     Since the MassDEP and Worcester Conservation Commission Orders of June and July of 2013, Defendants have not taken necessary measures to stabilize exposed soils and prevent silt-laden runoff at the Site.  They have not taken the Bittersweet Boulevard catch basins off line, and have not installed temporary sediment basins sufficient to handle stormwater runoff from the exposed soils of Phase IV.

Defendants have not installed stormwater detention systems or sediment barriers sufficient to prevent the migration of silt-laden stormwater onto Bittersweet Boulevard. Silt-laden stormwater has continued to run off of the exposed soils of Phase IV, onto Bittersweet Boulevard, into the Bittersweet Boulevard catch basins, out the Honeysuckle Road outfall, and into the Sophia-Honeysuckle wetland and stream.

48.     In recent months, Defendants' continuing failure to design, install, monitor, and maintain effective erosion and sediment control systems has been underscored by discharges of silt-laden stormwater from the Honeysuckle Road outfall on days including but not limited to[5] October 16, 2015, January 10, 2016, February 3, 2016, February 16, 2016, February 24, 2016, February 25, 2016, March 1, 2016, and April 7, 2016.

49.     On March 10, 2016, in consequence of Defendants' continuing silt-laden discharges from the Honeysuckle Road outfall, the Worcester Conservation Commission issued a Notice of Violation to Defendants, finding Defendants in violation of the Massachusetts Wetlands Protection Act, the Worcester Wetlands Protection Ordinance, and the Conservation Commission's Order of Conditions for Phase IV of the Project. The Commission demanded that Defendants immediately address their erosion and sediment control failures on Bittersweet Boulevard.

50.     On April 25, 2016, in consequence of Defendants' continuing silt-laden discharges from the Honeysuckle Road outfall, and Defendants' mismanagement of stormwater on Bittersweet Boulevard (including Defendants' illegal discharge of silt-

---

[5] Plaintiff does not imply that silt-laden discharges have occurred only on these specified dates since October 16, 2015. Plaintiff also does not imply that silt-laden discharges occurred any less often before October 16, 2015. Inferably, these discharges have been occurring during and after every appreciable storm since the Bittersweet Boulevard catch basins were installed.

laden stormwater into the City's sewer system, and Defendants' ill-conceived and ineffective use of Bittersweet Boulevard as a stormwater basin), the Worcester Department of Public Works and Parks (DPW&P) issued a letter to Defendants informing them that DPW&P would not issue any additional water or sewer permits to Defendants until Defendants resolved these issues.

51.     Defendants have met this most recent round of regulatory censure, and Plaintiff's notice of intent to sue, with a combination of denial, manipulation, and menace.  Steven A. Gallo has accused the City of Worcester of conducting a "witch hunt."  Robert H. Gallo has sent a No Trespass notice to the home of the Worcester Conservation Commission's duly authorized inspector.  Robert H. Gallo has called certain MassDEP and Worcester officials and tried to persuade them to tailor their written communications to Defendants' benefit, with the express aim of blunting the allegations in Plaintiff's anticipated lawsuit.  Robert H. Gallo has threatened an Assistant Commissioner of the Worcester DPW&P that he (Gallo) was going to "get him."

52.     In view of Defendants' longstanding neglect of erosion and sediment control at the Site, in view of Defendants' belief that they are being persecuted by the City of Worcester, and in view of Defendants' apparent preference for trying to resolve their chronic regulatory problems by manipulating and intimidating their regulators rather than by committing to a program of effective erosion and sediment control, Plaintiff reasonably anticipates that Defendants' neglect of erosion and sediment control will continue.

## VI.  CLAIMS

### COUNT 1:   FAILURE TO OBTAIN CGP COVERAGE
**(as to Defendants Gallo Builders, Inc., Steven A. Gallo, and Robert H. Gallo)**

53.      Paragraphs 1-52 of this Complaint are hereby re-alleged and incorporated by reference herein.

54.      Sediment is a "pollutant" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6).

55.      The Honeysuckle Road outfall is a "point source" within the meaning of Section 502(14) of the CWA, 33 U.S.C. § 1362(14).

56.      The Sophia-Honeysuckle wetland and stream, the stream into which it flows, the Worcester Flood Diversion Channel, and the Blackstone River are "waters of the United States," within the meaning of 40 C.F.R. § 122.2.

57.      Gallo Builders is an "operator" of the Site, within the meaning of that term as set forth in the CGP, because it both (a) has operational control over Site construction plans and specifications, including the ability to make modifications to those plans and specifications, and (b) has day-to-day operational control over those activities at the Site that are necessary to ensure compliance with the conditions of the CGP.

58.      As the operator of a construction project that disturbs five or more acres of land, and that discharges a pollutant from a point source to waters of the United States, Gallo Builders is required to obtain CGP coverage for itself in connection with the Site. *See* 33 U.S.C. §§ 1311(a), 1342.

59.      Since May 29, 2012, and continuing to the present day, Gallo Builders has been violating the CWA by operating the Site without CGP coverage.

60.     Besides Gallo Builders itself, Steven A. Gallo and Robert H. Gallo are each individually liable for Gallo Builders' unlawful failure to obtain CGP coverage, because Steven A. Gallo and Robert H. Gallo share executive responsibility for effecting Gallo Builders' compliance with environmental law—that is, for CWA liability purposes, they are Gallo Builders' "responsible corporate officers."

## COUNT 2:  VIOLATIONS OF THE CGP
### (as to all Defendants)

61.     Paragraphs 1-60 of this Complaint are hereby re-alleged and incorporated by reference herein.

62.     Gallo Builders is liable for the below CGP violations by virtue of its role as operator of the Site.

63.     Arboretum Village, LLC is liable for the below CGP violations by virtue of its ownership and avowed operation of the Site.

64.     Besides Gallo Builders and Arboretum Village, LLC, Steven A. Gallo and Robert H. Gallo are each individually liable for the below CGP violations by virtue of their shared executive authority over stormwater management and erosion and sediment control decisions and investments at the Site, and their shared executive responsibility for effecting their companies' compliance with environmental law—that is, for CWA liability purposes, they are Arboretum Village, LLC's and Gallo Builders' "responsible corporate officers."

65.     Each of the below CGP violations has been evident in Defendants' chronic failure to prevent the mobilization and migration of sediment from the exposed soils of Phase IV onto Bittersweet Boulevard, into the Bittersweet Boulevard catch basins, and out the Honeysuckle Road outfall.  Each of the below violations is either ongoing or

likely to recur, given Defendants' longstanding and habitual neglect of erosion and sediment control.

66.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.1.1.2 of the CGP by failing to take into account the following factors in designing their stormwater controls: (i) the amount, frequency, intensity, and duration of precipitation at the Site, and (ii) the nature of stormwater runoff at the Site, including factors such as expected flow from impervious surfaces, slopes, and site drainage features.

67.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.1.1.3(b) of the CGP by failing to use good engineering practices in installing stormwater controls at the Site.

68.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.1.1.4(a) of the CGP by failing to ensure that all erosion and sediment controls at the Site remain in effective operating condition, and are protected from activities that would reduce their effectiveness.

69.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.1.1.4(b) of the CGP by failing to promptly repair and/or modify their ineffective erosion and sediment controls.

70.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.1.2.2(a) of the CGP by failing to install sediment controls along those perimeter areas of the Site that will receive stormwater from earth-disturbing activities.

71.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Parts 2.3 and 2.3.2 of the CGP by failing to design, install, and maintain effective pollution prevention measures in order to prevent the discharge of pollutants from the Site.

72.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 2.3.2 of the CGP by failing to inspect, repair, and/or modify all pollution prevention controls at the Site in a timely manner.

73.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.1 of the CGP by failing to have a qualified person inspect their erosion and sediment controls.

74.      Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.2 of the CGP by failing to inspect their erosion and sediment controls every 7 days (or alternatively, every 14 days, and within 24 hours of every day on which .25 inches or more of rain falls).

75.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.5.2 of the CGP by failing to inspect all stormwater controls and pollution prevention measures at the Site.

76.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.5.4 of the CGP by failing to inspect all areas where stormwater typically flows within the Site.

77.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.6.1 of the CGP by failing to inspect whether all erosion and

sediment controls and pollution prevention measures at the Site are installed, operational, and working as intended to minimize pollutant discharges.

78.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 4.1.6.7 of the CGP by failing to initiate corrective action when failures of erosion and sediment control at the Site are observed.

79.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 5.2 of the CGP by failing to immediately take all reasonable steps to minimize or prevent the discharge of sediment from the Site, upon discovering that sediment is being discharged.

80.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 5.2.1.1 of the CGP by failing to install new or modified erosion and sediment controls—and, failing to repair existing controls—within 7 days of discovering that existing controls are not operating effectively.

81.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Part 6 of the CGP by failing to train Site personnel in the design, installation, maintenance, and/or repair of stormwater controls.

82.     Since June 21, 2013, and continuing to the present day, Defendants have been violating Condition #18 of the Worcester Conservation Commission's original Order of Conditions for Phase IV of the Project (or the equivalent Condition #16 of the Worcester Conservation Commission's amended Order of Conditions for Phase IV of the Project)—and thereby, violating Part 9.1.1.4 of the CGP—by failing to maintain all sedimentation barriers in good repair, failing to prevent the deposition of sediment in resource areas and storm drains, failing to inspect erosion controls daily, failing to

immediately control any erosion problems that occur at the Site, and failing to immediately notify the Commission of any such problems.

83.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Condition #20 of the Worcester Conservation Commission's original Order of Conditions for Phase IV of the Project (or the equivalent Condition #26 of the Worcester Conservation Commission's amended Order of Conditions for Phase IV of the Project)—and thereby, violating Part 9.1.1.4 of the CGP—by failing to securely establish all erosion and sediment controls at the Site so as to prevent any sediment from going under, through, or over them.

84.    Since June 21, 2013, and continuing to the present day, Defendants have been violating Condition #27 of the Worcester Conservation Commission's original Order of Conditions for Phase IV of the Project (or the equivalent Condition #36 of the Worcester Conservation Commission's amended Order of Conditions for Phase IV of the Project)—and thereby, violating Part 9.1.1.4 of the CGP— by failing to monitor, maintain, and adjust all erosion and sediment controls throughout the duration of the Project as required to prevent adverse impacts to resource areas.

## VII.  REQUEST FOR RELIEF

Plaintiff respectfully requests the following relief:

a.    A declaration that Defendants are and have been in violation of the CWA, as alleged herein.

b.    An order prohibiting any further CWA violations by Defendants.

c.    An order mandating that Defendants report to the EPA and Plaintiff, in writing, any discharge of sediment from the Site, and any failure of any stormwater

management or erosion and sediment control device to perform as designed; and further mandating that such report detail precisely the cause of such discharge or failure, and how such cause will be remedied.

      d.    An order mandating that Defendants submit all Site inspection reports required by the CGP to the EPA and Plaintiff.

      e.    An order mandating that Defendants remove any sediment that their stormwater discharges have deposited in wetlands and waters on or off the Site, and further mandating that Defendants restore all such wetlands and waters to their condition before Defendants polluted them.

      f.    An order that Defendants pay civil penalties, pursuant to Section 309(d) of the CWA, 33 U.S.C. § 1319(d), as adjusted at 40 C.F.R. § 19.4, for their violations of the CWA, both as specifically alleged herein and as will arise or continue after the time of this Complaint, in the amount of $37,500 per day for each day of each violation alleged, with continuous violations constituting a separate violation for each day that they persist.

      g.    An award of costs of this litigation to Plaintiff, including attorney fees and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(d).

      h.    Such other relief as this Court deems just and appropriate.

<div style="margin-left:2em;">

Respectfully Submitted by the Plaintiff,
THE BLACKSTONE HEADWATERS COALITION, INC.
By its Attorney:
*/s/ James P. Vander Salm*
James P. Vander Salm, Esq. (BBO# 663320)
Murphy & Vander Salm LLP
One Mercantile Street, Suite 740
Worcester, MA  01608
tel.: (508) 425-6330
fax: (508) 536-0834
vandersalm@mvsllp.com

</div>

Dated: May 6, 2016

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 7.1 and LR 7.3, Plaintiff states that it has no parent corporation, and is not owned to any degree by any publicly held company.